[Cite as *Buckeye Mobile Home Estates v. O'Coners*, 2022-Ohio-3927.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

Buckeye Mobile Home Estates

     Appellee

v.

Timothy O'Coners, et al.

     Appellant

Court of Appeals No.  F-22-004

Trial Court No.  CVG-21-00812

**<u>DECISION AND JUDGMENT</u>**

Decided:  November 3, 2022

* * * * *

Mark L. Powers, for appellee.

Joseph E. Stanford, for appellant.

* * * * *

**ZMUDA, J.**

**{¶ 1}** This matter is before the court upon appeal of the judgment of the Fulton County Court, Western District, awarding restitution of premises in an eviction proceeding.  Finding no error, we affirm.

# I.    Background

**{¶ 2}** Appellant Timothy O'Coners (appellant) appeals the trial court's judgment in an eviction proceeding.  Appellant and his wife, Rhonda O'Coners, jointly own a trailer and rented a lot from appellee, Buckeye Mobile Home Estates (appellee) through an oral, month-to-month lease.  About a year before eviction proceedings, Rhonda O'Coners moved from the trailer to an apartment in Napoleon, Ohio.

**{¶ 3}** Appellant is a disabled veteran, and following medical advice, he acquired two, German shepherd puppies as emotional support animals.  Appellee had knowledge of these puppies, and was aware that appellant intended to train them, but appellant did not initially inform appellee that the dogs were emotional support animals.  The mobile home park rules permitted pets, but restricted large dogs.  Appellee did not immediately object after appellant's dogs outgrew the size restrictions.  Appellant's lot was enclosed by vinyl fencing with two wooden gates.

**{¶ 4}** After the dogs grew large, appellee received numerous complaints from other tenants.  They complained of incessant barking at night and aggressive behavior toward other people and pets.  According to the complaints, the dogs tried to lunge through the fence and through the windows of appellant's residence, with other residents fearing the dogs would escape through the fence or a window.

**{¶ 5}** On October 26, 2021, appellee sent a written notice of noncompliance to appellant, informing him his dogs violated park rules because the dogs were an

2.

"annoyance to others [sic] park residents, and that such failures materially affect health and safety." Appellee further advised that appellant's tenancy would terminate on November 25, 2021, should he fail to remedy the violation.

{¶ 6} On November 26, 2021, appellant sent a request for reasonable accommodation, referencing an earlier letter he claimed he sent to appellee. Appellant included a letter from his VA psychiatrist, which stated, in part:

> Due to [appellant's] health condition that meets the definition of disability under the Fair Housing Act, [appellant] experiences impairment in functioning. To help alleviate this impairment, I am in support of [appellant] having up to two Emotional Support Animals (ESA) and request that [appellant] receive all legal rights associated with having an ESA. This ESA is necessary for [appellant] as the animals help to reduce stress and impairment associated with [appellant's] disability.

{¶ 7} Appellant did not vacate the premises or remove his dogs, and on December 16, appellee served a three-day notice on appellant pursuant to R.C. 1923.04 and filed a complaint for eviction. As grounds for eviction, appellee noted violation of regulations regarding the dogs' barking and aggressive behavior. Appellant received service of the eviction proceedings on January 6, 2022. The trial court held a hearing on January 18, 2022.

3.

**{¶ 8}** A representative for appellee testified that appellant began renting the lot in April 2018. Appellee became aware of appellant's dogs sometime in 2020 or 2021, after appellant called and told appellee he was acquiring the dogs so he could train them. Appellant had received a copy of the mobile home park rules which prohibited large dogs or conduct that disturbed quiet enjoyment of other tenants. Once the neighbors and other tenants began complaining to appellee, appellant was asked to remedy the situation and appellee believed that appellant would leave voluntarily. When appellant did not relocate and the dogs remained a nuisance, appellee initiated eviction proceedings.

**{¶ 9}** The trial court heard testimony from appellant's next-door neighbors (a husband and wife), who each testified that the dogs became a problem once they were grown, with "barking at all hours of the day and night," nearly every night, causing disruptions to sleep and everyday life. They also indicated the dogs charged the fence separating the lot between the properties, near the neighbors' patio. Often, they testified, appellant commanded the dogs to bark and charge the fence. Appellant's neighbors indicated the weight of the dogs moved the fence, and as a result of the noise and disruption, social gatherings were not possible in the yard.

**{¶ 10}** The neighbors also noted that the dogs acted aggressively from inside appellant's home, charging a side window that faced their house or charging a bay window visible to passersby. The husband noted:

4.

If you're walking past, whoever you are, you know, the dogs are in that particular room, they'll hit the glass, you know, and just bark and carry on, you know, and you can see the window moving.

The couple feared the windows would not hold and the dogs would break free, as the windows flexed with the weight of the dogs.

{¶ 11} In addition to this testimony, the neighbors and another tenant observed the dogs running free. Before the dogs were full grown, appellant's neighbor was able to corral them back into the yard, and told appellant that his dogs broke free. After the dogs grew big and his neighbors believed appellant was training the dogs to charge at them, appellant's neighbors did not attempt to catch the dogs, but stayed inside when the dogs broke free.

{¶ 12} The neighbors specifically testified regarding their fears, indicating appellant caused fear by "telling the dogs what to do all the time towards us," noting "we can't do anything without him yelling out the door telling his dogs to bark, charge or whatever. When we get in our car, we have that problem."

{¶ 13} In addition to appellant's next-door neighbors, another mobile home tenant testified that he was often awakened between midnight and 5:00 a.m. by the barking dogs, especially during warmer months. When he would visit appellant's next-door neighbors, appellant's dogs disrupted cookouts or gatherings by barking against the fence. He testified that "sometimes you can't even talk to each other." He also testified

5.

that the dogs charged the front window when he walked by and "people are scared to even go by."

{¶ 14} Appellant's wife testified that when she lived with appellant, she had a poor relationship with the next-door neighbors. She moved from the trailer about a year prior to the eviction proceedings and had little knowledge of the incidents described by the neighbors, having spent only about 20 nights in the trailer since relocating to an efficiency apartment in Napoleon. Appellant's wife had no issues with the other tenant who had testified about the dogs, and blamed the eviction proceedings on the next-door neighbors.

{¶ 15} Appellant also testified. He claimed the neighbors purposefully incited his dogs and caused them to bark by slamming doors and shouting at them. He presented video, which he claimed depicted the neighbors antagonizing his dogs while they were inside his yard. He also acknowledged he made no formal request for reasonable accommodation until after the park owner asked him to remove the dogs based on neighbor complaints.

{¶ 16} As to his ability to find new housing, appellant testified that he informed the park owner that the Homeless Veterans Assistance Program offered assistance in finding new housing should he be evicted, once he showed them documentation of a court-ordered eviction. Even so, appellant testified he would likely have to live in his truck until that program found him a new home. Appellant also testified that he did not

6.

have the means to relocate the trailer to another location. His wife had vacated the park about a year prior to the eviction proceedings and counsel elicited no testimony from appellant's wife regarding her ability to remove the trailer, which she co-owned with appellant.

{¶ 17} At hearing, appellant's counsel argued that appellant's dogs were protected by law related to assistance animals, and appellee could not evict appellant based on his emotional support animals without offering a reasonable accommodation. Additionally, as an equitable concern, counsel argued that appellant did not have the financial means to remove his trailer from the mobile home park's lot.

{¶ 18} The trial court issued a written decision, granting possession of the lot to appellee. The trial court weighed conflicting testimony in reaching its conclusion that appellee made all requested accommodations, as appellee permitted appellant to keep dogs over the park rules size restriction. The trial court credited appellant's and his wife's testimony that the dogs were good dogs, and that appellant was an appropriate pet owner "for the most part," but concluded appellant and his wife "failed to prevent their dogs from making unreasonable noise and/or running at large, as [appellant] himself acknowledge[d] to have occurred on four occasions." The trial court specifically addressed appellant's video evidence as "largely unpersuasive given the limited time periods and scope." There was no discussion, within the trial court's judgment, relative to financial hardship in removing the trailer from appellee's lot.

7.

{¶ 19} Appellant filed a timely appeal of the judgment, and upon motion by appellant, the trial court stayed execution of the judgment on the condition appellant deposit a "use and occupancy bond" in the amount of his monthly rental obligation.

## II.    Assignment of Error

{¶ 20} In his appeal, appellant raises a single assignment of error:

THE TRIAL COURT ERRED BY NOT CONSIDERING EQUITY BEFORE IMPOSING FORFEITURE OF APPELLANT'S MOBILE HOME.

{¶ 21} In arguing error by the trial court, appellant does not directly challenge the eviction proceeding relative to immediate possession of the lot. Instead, appellant argues that the eviction operated as a forfeiture of appellant's mobile home based on appellant's lack of resources to pay to remove the mobile home from appellee's property. The only issue before the trial court, however, was forfeiture of the lot lease in an eviction proceeding, a proceeding that did not affect appellant's or his wife's ownership of the mobile home located on the park's lot.

## III.    Analysis

{¶ 22} An eviction proceeding concerns only the present possession of specific property. *Haas v. Gerski,* 175 Ohio St. 327, 330, 194 N.E.2d 765 (1963). A mobile home park operator, such as appellee, "may bring an action under Chapter 1923. of the Revised Code for possession of the premises" if a resident is in violation of the park's

8.

rules. R.C. 4781.37(A)(4). Pursuant to R.C. 1923.02(A)(10) and (11), a park operator may maintain eviction proceedings upon breach of the park rules, where notice is provided as required under R.C. 4781.45. R.C. 4781.45, in turn, governs termination of an agreement with a mobile home park, as follows:

> If a resident commits a material violation of the rules of the manufactured home park, of the department of commerce division of industrial compliance, or of applicable state and local health and safety codes, the park operator may deliver a written notification of the violation to the resident. The notification shall contain all of the following:
>
> (A) A description of the violation;
>
> (B) A statement that the rental agreement will terminate upon a date specified in the written notice not less than thirty days after receipt of the notice unless the resident remedies the violation;
>
> (C) A statement that the violation was material and that if a second material violation of any park or division rule, or any health and safety code, occurs within six months after the date of this notice, the rental agreement will terminate immediately;
>
> (D) A statement that a defense available to termination of the rental agreement for two material violations of park or division rules, or of health and safety codes, is that the park rule is unreasonable, or that the park or

9.

division rule, or health or safety code, is not being enforced against other manufactured home park residents, or that the two violations were not willful and not committed in bad faith.

If the resident remedies the condition described in the notice, whether by repair, the payment of damages, or otherwise, the rental agreement shall not terminate. The park operator may terminate the rental agreement immediately if the resident commits a second material violation of the park or division rules, or of applicable state and local health and safety codes, subject to the defense that the park rule is unreasonable, that the park or division rule, or health or safety code, is not being enforced against other manufactured home park residents, or that the two violations were not willful and not committed in bad faith.

{¶ 23} Appellant does not dispute his violation of the park rules related to his barking dogs or the nuisance complaints of other tenants. Appellant also does not claim he made efforts to remedy any violation, aside from his testimony blaming the other tenants for his dogs' behavior or conceding his inability to prevent barking or contain his dogs on several occasions. Instead, appellant argues the trial court erred in weighing equitable concerns regarding his ability to remove the trailer he and his wife own from the appellee's mobile home park, should he be evicted from his lot in the park. We review the trial court's equitable consideration of the case, finding in favor of forfeiture

10.

of the lease, for an abuse of discretion. *Joseph J. Freed & Assoc., Inc. v. Cassinelli Apparel Corp.,* 23 Ohio St.3d 94, 96, 491 N.E.2d 1109 (1986).

{¶ 24} In defense against eviction, appellant did not argue that the park rules were unreasonable. The obligations embodied in the park's rules are similar to the obligations provided by R.C. 4781.39(A), which requires, in part, that a tenant "will not disturb the resident's neighbors' peaceful enjoyment of the manufactured home park." Violation of the rule permits a park operator to seek eviction. R.C. 4871.39(C). While not disputing the propriety of the eviction proceedings, appellant raises equitable concerns unrelated to the subject of an eviction proceeding, arguing the eviction will cause collateral hardship because he has insufficient resources to relocate the trailer he co-owns with his wife.

{¶ 25} In support of his equitable argument, appellant primarily relies on *Bowling Green Manor Ltd. Partnership v. Kirk,* 6th Dist. Wood No. WD-94-125, 1995 WL 386476 (June 30, 1995) and *Gorsuch Homes, Inc. v. Wooten,* 73 Ohio App.3d 426, 597 N.E.2d 554 (2d Dist.1992). However, neither case supports appellant's position.

{¶ 26} In *Bowling Green Manor,* Kirk leased an apartment in a complex that provided low-income housing pursuant to a restrictive covenant with the Ohio Housing Finance Agency, prohibiting eviction of a low-income tenant "for other than good cause" and defining "low-income" based on federal law and regulations. *Bowling Green Manor* at *1. Bowling Green Manor received tax credits in return for maintaining low-income housing. *Id.* at * 4.

11.

{¶ 27} To qualify as a low-income housing project, Bowling Green Manor was required to annually certify a tenant's income to qualify as a low-income tenant. *Id.* at * 2. After the one-year term, the apartment complex served Kirk with a written 30-day notice of termination, and "[t]he sole basis for termination listed in the notice was the lapse of the initial lease." *Id.* Kirk did not vacate the apartment, and was served with a three-day notice as a holdover tenant. *Id.* The matter proceeded to eviction before the Bowling Green Municipal Court.

{¶ 28} In the eviction proceeding, Bowling Green Manor argued federal law did not apply to the eviction, and therefore it did not need to provide notice of "good cause" grounds for eviction. *Id.* The trial court granted the complaint for eviction and issued a writ of restitution. *Id.*

{¶ 29} On appeal, Kirk argued that, while Bowling Green Manor was not a "public housing project" as defined by 24 C.F.R. 966.4(1), 24 C.F.R. 882.215 or any other federal regulation, it obtained a tax credit and entered a written agreement that required "good cause" to evict a low-income tenant. *Id.* *4. The issue on appeal, therefore, concerned proper notice required by a "private landlord of federally subsidized public housing[.]" *Id.* at * 5.

{¶ 30} We reversed, finding "the eviction procedures required under both Ohio law and the federal regulations promulgated by HUD for Section 8 evictions" applied, and Bowling Green Manor "was required to, among other things, provide [Kirk] with a

12.

thirty day written notice of termination setting forth the specific good cause grounds for termination[.]" *Id.* Based on this finding, we determined we need not address Kirk's equitable argument regarding "forfeiture of her leasehold."

{¶ 31} The Second District Court of Appeals addressed similar facts in *Gorsuch Homes, Inc. v. Wooten,* 73 Ohio App.3d 426, 597 N.E.2d 554 (2d Dist.1992). In that case, Wooten was a tenant of Gorsuch Homes under a Section 8 federally subsidized housing program. *Id.* at 428. Wooten lived at the apartment complex with a 100 percent subsidy, along with her daughter and teen-aged son. *Id.* at 429. After her son participated in spraying graffiti on exterior walls of the building complex, Gorsuch Homes served her with a 30-day notice of "material noncompliance with the lease justifying termination" unless Wooten paid the complex for the repair estimate to remedy the damage caused by her son. *Id.*

{¶ 32} The lease required Wooten to *reimburse* for any damage, and Gorsuch Homes rejected Wooten's offer to pay in monthly installments and refused to discuss the actual amount of damages caused by her son, one of three identified as causing the damage. *Id.* at 430. Her son was "scheduled to make restitution" for the damage as part of a juvenile court program, and Wooten wrote Gorsuch Home's regional manager to request a meeting. *Id.* Prior to receiving a response from the regional manager, Gorsuch Homes served her with a 10-day notice to leave the premises, with the grounds for termination specified as non-payment of damages within 30 days. *Id.* Subsequent

13.

requests by Wooten for a meeting regarding damages were refused, although Gorsuch Homes did schedule meetings to address complaints by other tenants regarding Wooten's children. *Id.* at 431.

{¶ 33} The matter proceeded before a referee, and the referee concluded that Wooten had materially breached the lease regarding her failure to pay the repair estimate for property damage, and recommended a writ of restitution issue. *Id.* The referee made no finding regarding the amount of actual damage caused by Wooten's son, and Gorsuch Homes had not paid the bill for the repair to the premises at the time they served notice of eviction. The trial court entered judgment as recommended and ordered restitution of the premises. *Id.*

{¶ 34} On appeal, Wooten argued she was denied due process, because, as a "tenant in federally subsidized housing," she was entitled "to have her landlord's claim for damages adjudicated at a hearing before a neutral person before her failure to pay the amount claimed may provide the basis for her eviction." *Id.* at 431-432. In reversing, the Second District noted a tenant's protected property interest in federally subsidized housing, and found that "a disputed claim for damages may not become a charge against a tenant's property right in her federally subsidized tenancy until the amount of the damages has been determined." *Id.* at 433. The Second District also noted the failure of Gorsuch Homes to provide a meeting to discuss proposed termination of Wooten's tenancy as an additional failure of due process protections. *Id.* at 434. As to equitable

14.

considerations, the Second District determined the trial court failed to consider Wooten's equitable defenses to foreclosure. *Id.* at 436.

{¶ 35} Unlike the present case, both *Bowling Green Manor* and *Gorsuch Homes* concerned Section 8 housing agreements and the rights of tenants in federally subsidized housing. The reversals, moreover, were based primarily on a lack of the due process required in Section 8 housing evictions. In *Gorsuch Homes,* the court found "[t]he due process requirements of the Fourteenth Amendment apply to private landlords who provide Section 8 federally subsidized housing for low-income tenants." *Gorsuch Homes* at 432. Furthermore, tenants in federally subsidized housing have "a constitutionally protected property interest in continued occupancy," and "absent good cause for eviction, a tenant may remain in the housing for life[.]" (Citations omitted) *Id.*

{¶ 36} Here, appellant asserted no claim based on subsidized housing, and the record contains no facts that would demonstrate any of the due process requirements for Section 8 evictions applied in this case. In sum, appellant failed to demonstrate a potential property interest "for life" as in *Bowling Green Manor* or *Gorsuch Homes.*

{¶ 37} As to equitable considerations, moreover, appellant argues equity relative to a collateral issue – removal of his trailer – and not equitable considerations argued as a defense to the eviction itself. While courts have the power to consider equitable defenses to "relieve a tenant from the consequences of forfeiture of a leasehold interest[,]" the consideration generally applies to monetary compensation for a violation in lieu of

15.

eviction. *See, e.g., Southern Hotel Co. v. Miscott, Inc.,* 44 Ohio App.2d 217, 337 N.E.2d 660 (10th Dist.1975) (where payment terms had not been strictly applied, trial court permitted to weigh the equities and permit late payment of amounts due to avoid forfeiture of the lease); *Gorsuch Homes,* 73 Ohio App.3d at 436, 597 N.E.2d 554 ("Generally, courts, in balancing the equities, will relieve a tenant from the harsh consequences of a forfeiture where the payment of money damages will adequately compensate the landlord.").

{¶ 38} In circumstances where the violation is not related to nonpayment of rent, equitable considerations might still apply and weigh against eviction. Appellant cites numerous examples of courts weighing equities in such cases, but the examples primarily include public housing tenants and efforts by those tenants to mitigate the violation. *See, e.g., Cuyahoga Metro. Hous. Auth. v. Harris,* 139 Ohio Misc.2d 96, 2006-Ohio-6918, 861 N.E.2d 179, ¶ 13 (CMHA sought to evict "an innocent tenant" based on criminal conduct of an unrelated guest, and tenant had no knowledge of the conduct); *Chillicothe Metropolitan Hous. Auth. v. Anderson*, 4th Dist. Ross No. 1406, 1988 WL 69118, (June 28, 1988), *8 (evicted for noise complaints and fights within the unit that disturbed other tenants and caused damage to the premises); *Portage Metro. Hous. Auth. v. Brumley*, 11th Dist. Portage No. 2008-P-0019, 2008-Ohio-5534, ¶¶ 94-95 (24 C.F.R. 966.4(l)(5)(vii)(B) provides factors to consider "such as the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, the effects

16.

that the eviction would have on family members not involved in the offending activity and the extent to which the leaseholder has shown personal responsibility and has taken all reasonable steps to prevent or mitigate the offending action."); *Bella Vista Apts. v. Herzner*, 125 Ohio Misc.2d 1, 2003-Ohio-4872, 796 N.E.2d 593, ¶ 10 (court weighed the proven harm to the landlord against the impact of eviction on the tenant); *Cincinnati Metropolitan Hous. Auth. v. Harris*, 1st Dist. Hamilton No. 35335, 1983 WL 8893, *1 (June 15, 1983) (considered criminal conduct of family member where tenant acted to remedy the problem).

{¶ 39} Considering appellant's legal authority and appellant's circumstances, we find little in common between subsidized housing tenants who attempted to mitigate or remedy violations and appellant's case. Unlike the tenants in the cited cases, appellant seeks a weighing of equities that depends on wholly discounting the testimony and evidence and placing all of the weight on appellant's claim that an eviction from the mobile home park lot will result in his loss of the trailer he co-owns with his wife. However, the evidence before the trial court demonstrated some contrary facts, or that appellant had some monthly income, some property of unknown value in northern Michigan, and the potential for assistance in relocating from a veterans program after eviction. Appellant's wife also testified that, while she spent some time at the mobile home park with her husband, she had a separate primary residence in Napoleon, with no testimony regarding her finances or ability to relocate the trailer.

17.

**{¶ 40}** We find no support in the law for weighing the equities as appellant directs. Instead, we find the trial court acted within its discretion in weighing the equities, including the violations, the lack of attempts to remedy the violations, and the hardship to appellant, prior to ordering eviction of the leased lot. Accordingly, we find appellant's sole assignment of error not well-taken.

### IV.   Conclusion

**{¶ 41}** Based on the foregoing, we affirm the judgment of the Fulton County Court, Western District. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.          _____
                                               JUDGE

Gene A. Zmuda, J.

                               _____
Myron C. Duhart, P.J.                        JUDGE
CONCUR.

                               _____
                                               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.